UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

04 SEP 30 PM 4: 11

| | | |
|---|---|---|
| WILLIE A. BRADFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 03-B-0707-S |
| | ) | |
| SMURFIT STONE CONTAINER CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED
SEP 3 0 2004

**MEMORANDUM OPINION**

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 15.)[1] Plaintiff Willie A. ("Tony") Bradford has sued his former employer, Smurfit Stone Container Corporation,[2] alleging that defendant discriminated against him on the basis of his race, black, and that it retaliated against him for complaining about race discrimination. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 15), is due to be granted.

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

[2]Defendant denies that it employed plaintiff, and it contends that plaintiff was employed by Stone Container Corporation, defendant's subsidiary. However, there is evidence in the record that defendant was plaintiff's employer. (Doc. 21, Exs. 3-6.) Therefore for purposes of deciding defendant's Motion for Summary Judgment, the court assumes, without deciding, that defendant was plaintiff's employer.



## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every **reasonable** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. STATEMENT OF FACTS

Plaintiff began working for defendant in November 1996. (Doc. 21, Ex. 20 ¶ 2.) On May 1, 2000, Glenn Smith, Plant Manager, promoted plaintiff to Converting Superintendent. (Doc. 16, Ex. E ¶¶ 1, 14,15.) As Converting Superintendent, plaintiff retained responsibility for supervising the third-shift. (Doc. 21, Ex. 20 ¶ 7.) Smith demoted plaintiff from Converting Supervisor to third-shift supervisor on or around August 29, 2001; he alleges that plaintiff was demoted because of his inadequate leadership and management. (Doc. 16, Ex. E ¶¶ 24, 25.) He testified that he believed that plaintiff never accepted the fundamental difference between managing an entire department and supervising a single shift and that he rarely worked more than the eight hours he was present on the third shift. (*Id.* ¶¶ 20-21.) Smith also testified, "As a supervisor, [plaintiff] was very good at keeping the productivity numbers up. But he did not give nearly enough attention to safety and quality and to enforcing company rules and policies." (Doc. 16, Ex. C at 39-40.) According to Smith, plaintiff was "very overbearing," and "abusive;" plaintiff "raised [his] voice a lot" and "threatened a lot." (*Id.* at 26.) Defendant did not reduce plaintiff's compensation after the demotion. (Doc. 16, Ex. A at 116.)

Plaintiff claims that he did not get adequate feedback from Smith regarding the job he was doing as Converting Supervisor. (*Id.* at 31.) However, Smith's appraisal of plaintiff's performance while Converting Supervisor is clear; Smith noted, "Tony has done a good job with untrained employees on third [shift] and kept productivity up. Tony has

achieved little in the overall converting operation." (Doc. 20, Ex. 5 at 0051.) Also, he noted that plaintiff's "ability to get results from other shifts" needed development. (*Id.*)

Plaintiff also felt that defendant should have provided him with more assistance when he was a Converting Superintendent, and that not providing the requisite assistance was racially discriminatory. (Doc. 16, Ex. A at 46-48; doc. 21, Ex. 20 ¶ 7.) Plaintiff testified that he believed that any other superintendent would have been provided that assistance. (Doc. 16, Ex. A at 46-48.)

Defendant hired Bobby Francis as a supervisor in May 2002. (Doc.16, Ex. E ¶¶ 28, 29.) Francis had previously worked for Weyerhaeuser Corporation. (*Id.* ¶ 28.) Smith testified that he considered the Weyerhaeuser plant where Francis had worked as a "world class facility." (*Id.*) He also stated that the Plant Manager there told him that Francis was "one of his best shift supervisors." (*Id.*) Francis was promoted to Converting Superintendent in October 2002. (*Id.*) He does not have a college degree. (*See* doc. 21, Ex. 15 at 0107.)

After Francis became Converting Superintendent, plaintiff told Joyce Dillard, Human Resources Manager at the Birmingham plant, that he believed the decision to promote Francis was discriminatory. (Doc. 16, Ex. A at 157-58.) He also told her:

> . . . I worked hard for that job. I know the plant like the back of my hand. I [had] been corrugated superintendent, I [had] been converting superintendent. Both of the jobs as far as I knew on paper I had performed . . . well. For somebody else to come in there from outside without knowledge of the plant, without knowledge of the customers or the people, it just wasn't right.
>
> . . .

> . . . They know I was capable of performing the job. And I wasn't afforded the opportunity and the support in order to perform the job.

(*Id.* at 158-59.) Dillard told plaintiff that he could talk with a corporate HR Manager outside of Birmingham, but plaintiff did not follow through with this complaint. (*Id.* at 161-63.)

Following Francis's promotion, issues arose with plaintiff's job performance and his relationship with Francis. On December 17, 2002, Smith issued a "Supervisor Performance Discussion," regarding plaintiff's job performance; this document states:

> The Company recognizes a pattern that indicates you are not willing to operate under the parameters or the direction set by . . . Management . . . .
>
> You have continued to supervise by intimidating the employees on third shift despite several discussions with Glenn Smith and Bobby Francis. Most recently a letter was received from an employee on 12-13 of the month describing verbal abuse and intimidation directed at that employee. In addition, several employees have expressed concern about returning to third shift under your supervision and others have indicated they bid on jobs to get away from your supervision.
>
> You have failed to comply with management's directives in the areas of, but not limited to, safety, quality and progressive discipline.
>
> You continue to avoid or attempt to otherwise ignore the presence and responsibility of Bobby Francis, the Converting Superintendent. You bring issues directly to the Plant Manager instead of taking them to the Converting Superintendent. You choose to avoid communicating with him daily.
>
> Most recently you have ignored the request of the Converting Superintendent and then the Plant Manager to complete and return the "Letter for the Boss."
>
> In view of the above, this constitutes a final written warning. You will be suspended until Friday 12-20-02. During this time, you are expected to complete the "Letter for the Boss" and submit to Bobby Francis by 10:00 am Friday. Moreover you are expected to submit a detailed plan to address the issues mentioned; intimidation as your form of supervision, lack of acknowledgment and communication with Bobby Francis, complying with

> management requests, following safety rules, use of internal QVR process, using the progressive discipline process properly. This must also be submitted to Bobby Francis by 10:00 am on Friday.

(Doc. 16, Ex. A, ex. 39.)

On February 11, 2003, Plaintiff advised Francis that a cutting die for an order had been misplaced and that "someone [in the Design Department or the die room] did not communicate [the] location of this tooling [which] [c]aused unnecessary downtime!" (*Id.* at 219-20 and ex. 46.) Via e-mail, Francis asked plaintiff to "address the root cause of the problem. Someone is responsible. You address their accountability and failure to do their job." (*Id.*, ex. 46.) Following this e-mail, Francis sent plaintiff two reminders to address the cause of the down time; one on February 13th and another on February 19th. (*Id.*, exs. 46 and 47.) On February 20, 2003, plaintiff responded; he sent Francis an e-mail, which stated: "Bobby, that was over a week ago [and] I don't remember what the details were at this time. I don't linger over anything that long[;] what ever happened will happen again. [We] [will] have to address it then." (*Id.*) Francis responded to this e-mail as follows:

> So, let me see if I can understand. You send me an e-mail on Feb. 11 to inform me of a situation where your machine center had "40+ Mins. of unnecessary downtime!" and the fact that "someone dropped the ball on this one". I reply with an expectation [to which] you failed to comply in a timely fashion, then [I] further inquired 2 more times and now your response is . . . "I don't remember, I don't linger, it will happen again, and we will address it **next** time."
>
> I thought it had importance to you the last time, apparently not. However it did have importance to me. The object here is to try and prevent the same scenario from occurring again by holding people responsible and accountable. You have chosen not to do that in this case. I have not. You remain accountable and due to your last response have now become totally

> responsible. Your lack of consideration to this issue has resulted in this instance being part of your personnel file.
>
> . . .
>
> Tony, my desire is that you understand this issue completely and take it seriously as you do the parts of your job that you do well.

(*Id.*, ex. 47 (emphasis in original).)

Plaintiff was absent from work on March 7-8, 2003 due to a stomach ulcer. (Doc. 21, Ex. 20 ¶ 20.) Consequently, Francis worked all or part of his two shifts. (Doc. 16, Ex. D ¶¶ 19 and 20.) Francis testified that, while working plaintiff's shifts, he noticed, what he called, "a number of disturbing things." (*Id.* ¶ 19.) He noted the following occurrences –

- Operator asleep in "the area past the counter ejector"

- Assistant Operator ESP violation

- Operator twice left stacker running when he went on breaks

- Press Trucker "[dropped two wide loads . . . and had no recollection or idea of it's [sic] occurrence

- Operator had "Coke, Chocolate, 2 types of candy and wrapper in the open at his work station"

- Die Room Utility found "leaning back [and] reading the paper in the die room"

- Helper was found "[eating from an open pack of cookies kept under the take off table.

- Three occurrences of two people sleeping on the job

(Doc. 21, Ex. 14 at 0443.) Francis, via e-mail, informed Smith and Dillard of these incidents, which he considered "a clear [indication] that there has been a lack of direction for the hourly

employees from a supervisory standpoint" on the third-shift. (*Id.*) Dillard forwarded Francis's e-mail to Carole Blessing, Regional HR Manager. (*Id.* at 0442.) Blessing recommended defendant give plaintiff "a critical incident report calling for a 10 day suspension and immediate improvement with the consequence of termination . . . assum[ing] that he does not have any current critical incident reports in his file. If he does have them for similar performance issues, you can terminate now." (*Id.*; doc. 16, Ex. C at 56.)

Meanwhile, Smith had "concluded that the evidence [from third-shift on March 7th and 8th] confirmed that Plaintiff had failed to properly train the third-shift employees in complete disregard of my directions to Plaintiff to adjust his management style and behavior to achieve better results." (Doc. 16, Ex. E ¶ 48.) Plaintiff was suspended pending "a decision on whether his employment should be terminated." (*Id.*)

Smith decided to terminate plaintiff because he determined "[p]laintiff was not likely to reverse his pattern of irresponsible behavior." (*Id.* ¶ 49.) He testified that he had decided to terminate plaintiff because:

> Plaintiff's job performance took a very serious turn for the worse after he was removed as Converting Superintendent, and then again after Francis was appointed to that position. As a result, Plaintiff failed to perform as expected as a Converting Supervisor in several respects. First, based on my observations, I believed that Plaintiff had refused to accept and recognize Bobby Francis as his supervisor. Second, Plaintiff was also notably deficient in helping me achieve the "*cultural changes*" that I was trying to instill. Specifically, Plaintiff simply refused to change his supervisory method from a confrontational "*in-your-face*" style to a more progressive approach. Third, Plaintiff failed to follow management directives in the areas of safety, quality, and progressive discipline. Fourth, Plaintiff failed to properly train and supervise his subordinates. Plaintiff's failure to properly train and supervise his subordinates resulted in those subordinates being found asleep while on

> shift, committing numerous safety violations, and violating the workplace rules against having food at their work stations. As a result, I concluded that Plaintiff was unwilling or unable to accept responsibility for the employees and operations under his supervision and abandon the traditional method of authoritative supervision and adapt to a more progressive style of leadership.

(*Id.* ¶ 50.) Plaintiff testified that, except for the last six months of his employment, he had no problems with Smith and always found him to be a fair person. (Doc. 16, Ex. A at 26-27.)

After plaintiff was terminated, the next supervisor hired was Otis Brown, black, and, according to defendant's personnel records, Eugene Galleried, black, was promoted from an hourly position to replace plaintiff. (Doc. 16, Ex. E ¶ 57; *id.*, Ex. F ¶¶ 5-6 and exs. A-B.)

### III. DISCUSSION

Plaintiff alleges that defendant discriminated against him on the basis of his race, in violation of 42 U.S.C. § 1981, when it did not promote him to the position of Converting Superintendent in November 2002. He also claims that his termination in March 2003 was based on his race and in retaliation for complaints of race discrimination regarding the promotion of Francis in November 2002.

### A. DEMOTION CLAIM

Defendant contends that plaintiff cannot prove that his demotion from Converting Superintendent on August 29, 2001, was discriminatory. The court notes that Plaintiff neither alleged such a claim in his Complaint, nor does he present an argument in opposition to defendant's Motion for Summary Judgment in his Memorandum in Opposition to Summary Judgment. Therefore, to the extent plaintiff has a claim based on his demotion, he has abandoned such claim. *See Smith v. International Paper Co.*, 160 F. Supp. 2d 1335,

1347 (M.D. Ala. 2001)(citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.), *cert. denied* 516 U.S. 817 (1995)). Defendant's Motion for Summary Judgment as to any claim based on plaintiff's demotion claim, to the extent such claim is alleged, will be granted, and such claim will be dismissed.

### B. PROMOTION CLAIM

Plaintiff alleges that defendant did not promote him to the position of Converting Superintendent that was awarded to Bobby Francis in November 2002 because of his race. When asked whether he considered plaintiff for the position of Converting Superintendent at the time he selected Francis, Smith testified, "We considered [plaintiff's] experience when we promoted him to converting superintendent. After that, after he had been demoted, we did not consider it again." (Doc. 16, Ex. C.)

To establish a prima facie case of discrimination with regard to promotion decisions, plaintiff must prove: (1) he is a member of a protected class; (2) he was qualified and applied for an available position, (3) he was rejected despite his qualifications; and (4) the position was filled by an employee who is not a member of the protected class. *Walker v. Northam*, 158 F.2d 1177, 1186, 1191-93 (11th Cir. 1998)(citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 186-88 (1989); *Crawford v. Western Electric Co.*, 614 F.2d 1300, 1315 (5th Cir. 1980)). "Once a prima facie case is established, a defendant must proffer legitimate, nondiscriminatory reasons for its employment decision." *Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1361 (11th Cir. 1999)(citing *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998)). If defendant carries this burden of production, "the

presumption of discrimination [created by plaintiff's prima facie showing] is eliminated, and the plaintiff must submit evidence showing that the articulated reason is pretextual. If pretext is established, summary judgment in favor of the defendant is generally inappropriate." *Walker v. Prudential Property & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002)(citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *Chapman v. AI Transport*, 229 F.3d 1012, 1025 n. 11 (11th Cir. 2000); *Combs*, 106 F.3d at 1538).

Plaintiff may establish that an articulated reason is a pretext for unlawful discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989)(quoting *Goldstein v. Manhattan Industries*, 758 F.2d 1435, 1445 (11th Cir. 1985)(citing *Burdine*, 450 U.S. at 256)). If a plaintiff chooses to establish pretext by showing that his employer's proffered reason is unworthy of credence, he must attack that reason "head on and rebut it." *Chapman*, 229 F.3d at 1030. He must offer evidence that "casts sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).; *see also Damon*, 196 F.3d at 1361.

The "pretext analysis focuses on a narrow question: Would the proffered evidence allow a reasonable factfinder to conclude that the articulated reason for the decision was not the real reason?" *Prudential*, 286 F.3d at 1276 (citations omitted). "'Discrimination is about

11

actual knowledge, and real intent, not constructive knowledge and assumed intent.' When evaluating a charge of employment discrimination, then, [the court] must focus on the ***actual knowledge*** and ***actions*** of the ***decision-maker***." *Id.* at 1274 (quoting *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir.2001) and citing *Bass v. Board of County Comm'rs*, 256 F.3d 1095, 1105 (11th Cir.2001))(emphasis added).

The court assumes, without deciding, that plaintiff can establish a prima facie case of discrimination with regard to the promotion to Converting Supervisor "because [the court] find[s] that [defendant's] legitimate reasons for the decision are dispositive." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

Smith testified that Francis's experience, "eighteen years at the Weyerhaeuser plant in Tithonia, Georgia," (doc. 16, Ex. C at 32), "was the main reason [defendant] hired Mr. Francis," (*id.*). He testified:

> [Francis's experience] overrides all of that, overrides all education. That was the main reason we hired Mr. Francis, because he was successful, not only at Weyerhaeuser. He moved up consistently. He was promoted into a shift supervision position under the person that . . . I felt like was the most successful plant manager in the industry.

(*Id..*) He also testified that plaintiff was ***not*** considered for the position after his demotion. (*Id.* at 37-38.)

These reasons for selecting Francis and not selecting plaintiff are sufficiently specific to shift the burden to plaintiff to establish that the reasons are unworthy of credence.

Plaintiff argues:

12

> On November 1, 2002, the company announced that Bobby Francis was selected for the converting superintendent position. In selecting Francis, Smith choose someone who had been employed approximately six months, and in four years prior to working for [defendant], held four different jobs primarily related to the auto sales. Francis was terminated from the paper related job he held between 1998 and 2002.
>
> Although, the company prefers a four [year] degree for the converting superintendent position, Francis does not have that qualification. Bradford does have a four year degree. Bradford had also been successfully employed with [defendant] for six years when Francis was promoted. Francis did not have to formally apply for the job, but it was simply awarded to him. Prior to selecting Francis, Glenn Smith, plant manager, did not post the job, or consider any other applicants.
>
> Smith testified that he did [not] consider Bradford because he believed that Bradford failed to properly perform the superintendent job. However, Bradford was required to do his 3rd shift . . . supervisor job and converting superintendent job. This requirement was not imposed on Bradford. Bradford was part of the team that turned the plant into a profitable facility.

(Pl. Mem. in Opp. to Mot. for Summ. J. at 18-19 (internal citations to the record omitted).)

"[T]he Eleventh Circuit Court of Appeals has repeatedly held that, where a claim of discrimination is based on relative qualifications, disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face.'" *Hall v. Alabama Ass'n of School Boards*, 326 F.3d 1157, 1167-68 (11th Cir. 2003)(internal citations and quotations omitted). The court finds that defendant could prefer Francis's experience over all other qualifications for the position, and that the disparities between Francis's qualifications and plaintiff's qualifications are not "so apparent as virtually to jump off the page and slap [one] in [the] face." *Id.*

13

Moreover, a reasonable employer could determine that plaintiff was disqualified for the position of Superintendent because of his prior insufficient performance and resulting demotion. Plaintiff argues, "Smith testified that he did [not] consider Bradford because he believed that Bradford failed to properly perform the superintendent job. However, Bradford was required to do his [third] shift supervisor job and converting superintendent job. This requirement was not imposed on [Francis]." Although plaintiff may be correct that his failure to properly perform as Converting Superintendent while in that position was the result of his contemporaneous service as third-shift Supervisor, such evidence does not "meet . . . head on and rebut" defendant's articulated reason that he was not considered for the Converting Superintendent position from which he had been demoted *because* he had been demoted from that position. *Chapman*, 229 F.3d at 1030.

Because, the court finds plaintiff has not established that defendant's reasons for selecting Francis, and not selecting him, for the Converting Superintendent position are unworthy of credence, defendant's Motion for Summary Judgment will be granted and plaintiff's discrimination claims based on this promotion will be dismissed.

## C. TERMINATION

Plaintiff contends that he was terminated because of his race and in retaliation for complaining about race discrimination. (Doc. 1 ¶¶ 24, 25.)

### 1. Race Discrimination

Defendant contends that plaintiff cannot establish a prima facie case of race discrimination with regard to his termination because he cannot establish that he was

14

replaced by someone outside the protected class. According to plaintiff, Francis testified that the two supervisors on third shift are Chat Helium, black, and Michael Brown, white. Plaintiff contends that because Helium was a supervisor at the time he was terminated, and because Michael Brown was hired after he was terminated, Michael Brown is his replacement. The court disagrees.

Helium was reassigned to third shift after plaintiff was terminated. However, Otis Brown, black, was the first supervisor hired after plaintiff's termination, not Michael Brown. Eugene Galleried, black, was the next supervisor selected; he was promoted from an hourly position to fill the supervisory vacancy created by plaintiff's termination. The only information in the record regarding Michael Brown is that he was working on the third shift at the time of Francis's deposition on December 12, 2003.[3]

The court finds that Francis's testimony that Michael Brown was a third shift supervisor on December 12, 2003 is not sufficient evidence to create a disputed issue of fact regarding whether plaintiff's replacement was outside his protected class. Plaintiff has not

---

[3]Francis testified as follows:

> Q. And do you know who's on third shift today [December 12, 2003]?
>
> A. Chat Helium and Michael Brown.
>
> Q. And Michael Brown, is that a new hire?
>
> A. Yes.

(Doc. 16, Ex. B at 60-61.)

15

presented any evidence that a white employee was selected to fill a supervisory position before defendant selected Otis Brown and Eugene Galleried. Therefore, plaintiff has not shown that he was replaced by someone from outside his protected class.

Because plaintiff cannot establish a prima facie case of discrimination with regard to his termination, such claim is due to be dismissed.

### 2. Retaliation

In order to establish a prima facie case of retaliation, plaintiff must show: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)(quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir.1998)(quoting *E.E.O.C. v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir.1993)))(internal quotations omitted). "Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff." *Id.* (citations omitted).

The court assumes, without deciding, that plaintiff can establish a prima facie case of retaliation "because [the court] find[s] that [defendant's] legitimate reason[ ] for the decision [is] dispositive." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

Plaintiff may establish that an articulated reason is a pretext for retaliation "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989)(quoting *Goldstein v. Manhattan Industries*, 758 F.2d 1435, 1445 (11th Cir. 1985)(citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)), *cert. denied* 474 U.S. 1005 (1985)). If a plaintiff chooses to establish pretext by showing that his employer's proffered reason is unworthy of credence, he must attack that reason "head on and rebut it." *Chapman*, 229 F.3d at 1030. That is, plaintiff must offer evidence that "casts sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)); *see also Clay v. Holy Cross Hospital*, 253 F.3d 1000, 1005-06 (7th Cir. 2001)("Pretext means a dishonest explanation, a lie rather than an oddity or an error. A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks. On the issue of pretext, our only concern is the honesty of the employer's explanation. Thus, even if [defendant's] reasons for [plaintiff's] termination were mistaken, ill considered or foolish,

so long as [defendant] honestly believed those reasons, pretext has not been shown.")(internal citations and quotations omitted.)

According to Smith, he "fired [plaintiff] for a combination of his unwillingness to change, his unwillingness to accept [Francis] and respond to [Francis] as the converting superintendent, for his resistance to implement and enforce procedures and policies." (Doc. 16, Ex. C at 66-67.) He identified four reasons why he decided to terminate plaintiff, including:

1.  His belief that "[p]laintiff had refused to accept and recognize Bobby Francis as his supervisor."

2.  He found plaintiff was "notably deficient in helping [to] achieve the 'cultural changes' that [he] was trying to instill."

3.  Smith determined that plaintiff had "failed to follow management directives in the areas of safety, quality, and progressive discipline. "

4.  Smith determined that plaintiff had "failed to properly train and supervise his subordinates," which had "resulted in those subordinates being found asleep while on shift, committing numerous safety violations, and violating the workplace rules against having food at their work stations."

(Doc. 16, Ex. E ¶ 50.)

Plaintiff "contends that in light of his performance[,] which until he was terminated was considered superior or successful, the termination had no basis in fact." (Pl. Mem. in Opp. to Mot. for Summ. J. at 15.) The record does not support plaintiff's contention that his performance was considered superior until his termination. Indeed, plaintiff was notified several times that his performance in all areas, except production, was in need of serious

18

improvement. Moreover, plaintiff has not produced evidence sufficient to establish a genuine question of fact as to whether Smith *believed* plaintiff's job performance was deficient and that he had failed to improve, and/or whether Smith was motivated to terminate plaintiff because of his protected activity.

Because plaintiff has not established a genuine issue of fact as to whether defendant's articulated reason for his termination is a pretext and the real reason was retaliation, defendant's Motion for Summary Judgment as to this claim is will be granted, and such claim will be dismissed.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law. An order granting defendant's Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 30th day of September, 2004.

SHARON LOVELACE BLACKBURN
United States District Judge